Rozlyn **ACKERMANN**, Individually and as a Personal Representative of Martin Lindsey Ackermann

v.

**WYETH PHARMACEUTICALS.**

No. 4:05CV84.

United States District Court,
E.D. Texas,
Sherman Division.

Dec. 7, 2006.

David Booth Alden, Edward J. Sebold, Mark Herrmann, Jones Day, Cleveland, OH, David S. Rutkowski, Jones Day, Washington, DC, Susan E. Burnett, Michael R. Klatt, Clark Thomas & Winters, Austin, TX, for Wyeth Pharmaceuticals.

## MEMORANDUM ADOPTING REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

SCHNEIDER, District Judge.

Came on for consideration the above-referenced civil action, this Court having heretofore ordered this case be referred to Magistrate Judge Don D. Bush for all pretrial purposes.

The report of the United States Magistrate Judge, which contains proposed findings of fact and recommendations for the disposition of Defendant's Motion for Summary Judgment (Docket No. 77), has been presented for consideration. The Court having made a *de novo* review of the objections raised by Plaintiff thereto, is of the opinion that the findings and conclusions of the Magistrate Judge are correct, and the objections of the Plaintiff are without merit. Therefore, the Court hereby adopts the findings and conclusions of the Magistrate Judge as the findings and conclusions of this Court. It is, therefore,

**ORDERED** that the Magistrate Judge's Report is **ADOPTED** as the opinion of the Court. It is further

**ORDERED** that Defendant's Motion for Summary Judgment is hereby the **GRANTED.**

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

BUSH, United States Magistrate Judge.

Before the Court is Defendant's Motion for Summary Judgement. (Docket No.

Arnold Anderson (Andy) Vickery, Vickery & Waldner, Houston, TX, for Rozlyn Ackermann, Individually and as a Personal Representative of Martin Lindsey Ackermann.

77). The facts of the case are essentially not in dispute. On January 17, 2002, Plano police were dispatched to the home of Martin Ackermann ("Ackermann"). Ackermann's son had called 911 notifying the dispatcher that his father had shot himself. Police encountered the son and his mother, the Plaintiff in this action, outside the house "screaming and crying." The son told police that "he (Ackermann) shot himself and there's blood everywhere." The police entered the residence and found Ackermann in an office /study area. According to reports and the autopsy results, he had shot himself in the mouth with a revolver.

Ackermann had been depressed. Mrs. Ackermann told hospital personnel a number of factors which may have played some role in his depression. She stated that she had recently been treated for breast cancer, that Ackermann's brother had died of cancer and that his mother had Alzheimer's disease. There was also information that his business had suffered since the 9–11 attacks and that he had been seeing a psychiatrist. His wife said he had been taking Selexis [sic] and she thought the medication had caused him to talk strangely. (Def.'s Mot. Summ. J., Ex. L). A toxicology exam revealed only the presence of citalopram which is marketed under the brand name of Celexa, manufactured by Forest Laboratories. (*Id.*, Ex. K). Medical reports on admission to ER also note that he was taking Celexa. (*Id.*, Ex. M).

Ackermann was treated for depression prior to the time he saw Dr. Sonn. There is no dispute that he was taking Celexa prior to the time he saw Dr. Sonn. He filled a prescription for Celexa on November 12, 2001. Celexa is a selective serotonin reuptake inhibitor ("SSRI"). He was referred to Dr. Sonn by a lawyer friend. He saw Dr. Sonn on the evening of January 4th and again on January 5th, 2002. Dr. Sonn testified that he also saw Ackermann on January 9th and January 12th, 2002. Dr. Sonn testified that he gave Ackermann a sample pack of Effexor. Effexor is manufactured by Wyeth Pharmaceuticals ("Wyeth"). The pack contained dosage for two weeks. The sample pack Dr. Sonn gave Ackermann was labeled "Sample–Not For Sale" on both the box and the pill-blister pack inside the box. For the first week, Ackermann was to take one pill of 37.5 milligram strength. The second week, the dosage increased to 75 milligram strength. According to Mrs. Ackermann, her husband took three 37.5 milligram tablets on January 6th, 7th and 8th respectively, and then four more 75 milligram tablets on the 9th through the 12th. It does not appear he took any Effexor after January 12th. Dr. Sonn testified that he last saw Ackermann on the 12th and that Ackermann complained that the medication was affecting his "manhood." Ackermann terminated his relationship with Dr. Sonn on January 12th. It appears from Mrs. Ackermann's deposition that Ackermann resumed taking Celexa after discontinuing Effexor. She claims that Dr. Sonn put him back on Celexa. In any event, the presence of Celexa in his blood indicates that he went back on Celexa and there does not appear to be much dispute on this issue.

When Dr. Sonn treated Ackermann, he (a) reviewed the Effexor package insert that was reproduced in the Physicians' Desk Reference (Def.'s Mot. Summ. J., Ex. C, Sonn. Dep. at 42:11–43:25, Dec. 19, 2005); (b) was aware that depressed patients have a heightened risk of suicide (*Id.* at 18:16–19, 28:4–12, 28:15–19); (c) was aware of the need to monitor depressed patients for suicidal thinking and monitored Ackermann for that purpose (*Id.* at 32:10–14, 34:3–5); (d) was aware of claims that Effexor might be causally related to

suicide or suicidality and considered those risks in treating Ackermann (*Id.* at 38:9–18); (e) chose (and still chooses) not to discuss suicide-related risks with patients directly because mentioning suicide might prompt suicidal thinking or cause patients to stop treatment (*Id.* at 1117:20–22, 119:20–120:20, 121:21–25); (f) was aware that some Effexor patients attempt suicide, have suicidal ideation, and experience agitation or akathisia, but saw no signs of those in Ackermann (*Id.* at 41:2–8, 44:1–7, 44:12, 45:7–15, 48:6–9, 98:23–25, 133:12–14, 136:14–18; 150:18–22); (g) was aware that patients who have taken large doses of Effexor for substantial periods of time may need to be tapered off Effexor (*Id.* at 25:20–25, 147:1–3); and (h) saw no need to taper Ackermann off Effexor because he had taken only a low dose for a short period of time (*Id.* at 145:17–146:2, 148:4–10).

Despite his current knowledge of Ackermann's suicide and changes to antidepressant warnings made since January 2002, Dr. Sonn (a) still believes Effexor's January 2002 package insert gave adequate warnings about the drug's suicide-related risks (*Id.* at 53:22–54:2, 116:5–8); (b) would prescribe Effexor to Ackermann today (*Id.* at 157:10–13); (c) would take the same approach to warnings that he did with the Ackermanns in January 2002 (*Id.* at 127:16–19; 130:5–8; 157:2–7; 187:11–19; 188:7–20); and (d) believes Effexor's benefits outweigh its risks (*Id.* at 20:23–21:2).

### Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Disputes about material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence and inferences from the summary judgment record must be viewed in the light most favorable to the nonmovant. *Minter v. Great Am. Ins. Co.,* 423 F.3d 460, 465 (5th Cir.2005); *See also McNeil v. Wyeth,* 462 F.3d 364 (5th Cir.2006).

### Fraud and Misrepresentation

In her complaint, Plaintiff sued for fraud and misrepresentation. In her amended response, Plaintiff has abandoned these theories of recovery. Therefore, Defendant is entitled to judgement on these claims.

### Breach of Warranties and DTPA

In her complaint, Plaintiff also sues for breach of express and implied warranties. She never specifies what implied warranties nor what express warranty she is referring to in her complaint. Her response to Defendant's Motion for Summary Judgement on this ground is no model of clarity. The gist of Plaintiff's complaint is that not enough was disclosed, not that there was a disclosure that somehow was breached. She claims that implied warranties were breached without much specification. Plaintiff "bootstraps" her breach of warranty claim into a Deceptive Trade Practices Act ("DTPA") claim under Tex. Bus. Comm.Code section 17.50(a). Wyeth argues that there can be no breach of warranty in that Ackermann never purchased Effexor from Wyeth nor did he do so from Dr. Sonn. In fact, Wyeth argues that Dr. Sonn merely gave Ackermann free samples. Plaintiff argues that he can be a consumer under the DTPA since he "purchased or acquired" medical services from Dr. Sonn. Privity is not required to enforce an express warranty under the DTPA. *U.S. Tire–Tech, Inc. v. Boeran, B.V.,* 110 S.W.3d 194 (Tex.App.-

Houston [1st Dist.] 2003, *pet. denied*). Privity is not required in order to be a consumer under the DTPA. *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex.1996); *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540–41 (Tex.1981). Yet, the DTPA does not define or create any warranties. *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 438 (Tex.1995). Warranties actionable under the DTPA, both express and implied, must be first recognized by common law or created by statute. *Id.*

Sections 2.313, 2.314 and 2.315 of the Tex. Bus. Comm.Code contemplate a sale: "... any affirmation of fact or promise made by the seller to the buyer," § 2.313(a)(1); "... a warranty that the goods shall be merchantable is implied in a contract for their sale," § 2.314; and "where the seller at the time of contracting has reason to know any particular purpose for which the goods are required ..." § 2.315. A sale consists in the passing of title from the seller to the buyer for a price. *Id.* at § 2.106. A buyer means a person who buys or contracts to buy goods. *Id.* at § 2.103(a)(1). A seller means a person who sells or contracts to sell goods. The definition of goods by implication excludes services. *Id.* at § 2.105. A contract refers to a *sale* of goods. Bottom line, under strict statutory interpretation, there must be an underlying sale to trigger the applicability of the Uniform Commercial Code ("UCC").

 In any event, the Court agrees with the Defendant that no express warranty was identified, but more importantly, there has been no showing that Ackermann relied on any express warranty. In Texas, reliance is not only relevant to, but an element of proof, for sustaining a claim for breach of an express warranty. *See generally, Compaq Computer Corp. v. Lapray*, 135 S.W.3d 657 (Tex.2004). Here,

there is absolutely *no evidence* that Ackermann relied on any affirmation by Wyeth. Summary Judgment is appropriate for Wyeth on Plaintiff's claim for breach of express warranty without further discussion or analysis. Any claim for a DTPA violation based on breach of an express warranty is also foreclosed. As to a breach of an implied warranty of merchantability under Tex. Bus. Comm.Code section 2.314, no privity of contract is required in a suit for personal injuries, i.e. whether analyzed as horizontal or vertical privity. *See Garcia v. Tex. Instruments*, 610 S.W.2d 456 (Tex.1980). Under the Texas Supreme Court's reasoning in *Garcia*, a person who has not purchased a product can still sue for breach of an implied warranty. However, Wyeth argues that there must still be an underlying sale of goods to create a nexus of liability and trigger applicability of the UCC. In this case, there is no disagreement that the Effexor given to Ackermann was a free sample furnished by Wyeth. Plaintiff argues that there was an "expectation of a sale" or that Ackermann purchased services, and therefore goods, from Dr. Sonn. There is no evidence that Ackermann ever purchased Effexor from Dr. Sonn. No bill has been produced which references any such transaction. In fact, the sample pack notes that the drugs are merely samples and *not for sale*. (Def.'s Mot. Summ. J., Ex. I). Under Texas law, the UCC only applies to transactions involving the sale of goods. Tex. Bus. Comm.Code § 2.102; *Loyd v. ECO Res., Inc.*, 956 S.W.2d 110 (Tex.App.-Houston [14th Dist.] 1997, *no pet.*). Mere promotion of the drugs is not the same as a sale of the drugs. *Yurcic v. Purdue Pharm., L.P.*, 343 F.Supp.2d 2d 386 (M.D.Pa.2004). Moreover, to demonstrate a breach of an implied warranty of merchantability, a plaintiff must establish that the product has a defect which renders it unfit for its ordinary purpose.

*Gen. Motors v. Garza,* 179 S.W.3d 76 (Tex. App.-San Antonio 2005, *no pet.*). To recover damages for breach of an implied warranty of merchantability, a plaintiff must prove there was some defect in the product, that is to say, a condition of the goods that renders them unfit for the ordinary purpose for which they are used because of a lack of something necessary for adequacy. *Otis Spunkmeyer, Inc. v. Blakely,* 30 S.W.3d 678 (Tex.App.-Dallas 2000, *no pet.*). There is no evidence that Effexor is not fit for the ordinary purpose for which it is used, treating depression and general anxiety order. The gravamen of Plaintiff's complaint is that a drug which is normally fit for most patients reacts in a certain way with a small group of patients and therefore increases the risk of suicide. The fact that drugs such as Effexor may cause different reactions in a small group of patients is not tantamount to a holding that the drug is somehow inadequate. Notwithstanding the fact that there was no underlying sale, the Court agrees that to maintain the claim for breach of warranty, notice was required. TEX. BUS. COMM.CODE § 2.607(c)(1); *Ibarra v. Nat'l Const. Rentals, Inc.,* 199 S.W.3d 32 (Tex.App.-San Antonio 2006, *no pet.*). Plaintiffs failed to give the requisite notice or to specify why such notice was excused. *U.S. Tire–Tech., Inc.,* 110 S.W.3d at 199. Although the Supreme Court of Texas has not ruled on this specific point, the official comment to section 2.607(c)(1) states *inter alia* that a plaintiff who is a mere beneficiary must notify the seller that an injury has occurred. *See Wilcox v. Hillcrest Mem. Park of Dallas,* 696 S.W.2d 423 (Tex.App.-Dallas, 1985), *aff'd per curiam,* 701 S.W.2d 842, 843 (Tex.1986). One case has held that under facts similar to this case, furnishing samples of drugs is not a sale which triggers applicability of the UCC. *Allen v. Ortho Pharm. Corp.,* 387 F.Supp. 364 (S.D.Tex.1974). Moreover, section

2.315 further contemplates that the "seller" has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods. Notwithstanding that Ackermann is not a buyer as defined by the Act, there is no showing that he was relying on Wyeth's skill or judgment. To the contrary, he was relying on the skill and judgment of Dr. Sonn. Effexor, like most drugs, is also indicated for other disorders, therefore, it could not be said that Wyeth would have reason to know of the particular purpose for which Effexor would be used. (*See* Def. Mot. Summ. J, Ex. G) (indicates that Effexor can be used to treat depression as well as General Anxiety Disorder). The Court concludes that Plaintiff may not prevail on her claims for breach of an implied warranty as well as an express warranty. For the reasons stated, the Court finds that Defendant is entitled to summary judgment on Plaintiff's claims under the DTPA, as well as breach of express and implied warranties.

### *Does the Learned Intermediary Doctrine Bar Plaintiff's Relief?*

In prescription drug product liability cases, it is reasonable for the manufacturer to rely on the health care provider to pass on its warnings, as the learned intermediary understands the propensities and dangers involved in the use of a given drug, and as the prescriber, he or she stands between the drug and the ultimate consumer. *Wyeth–Ayerst Labs. Co. v. Medrano,* 28 S.W.3d 87 (Tex.App.-Texarkana 2000, *no pet.*). Texas, like most jurisdictions, has adopted section 402A of the RESTATEMENT OF TORTS for product liability claims. *Nobility Homes, Inc., v. Shivers,* 557 S.W.2d 77, 79–80 (Tex.1977). Under that section, "[i]f a product is un-

reasonably or inherently dangerous, a warning is required." *Gravis v. Parke–Davis & Co.,* 502 S.W.2d 863, 870 (Tex. Civ. App.-Corpus Christi 1973) (*citing* RESTATEMENT (SECOND) OF TORTS § 402(A) (1965)). Although adequacy as to a warning is generally a question for the fact finder, *Williams v. Upjohn Co.,* 153 F.R.D. 110, 114 (S.D.Tex.1994), in cases involving prescription drugs involving the learned intermediary doctrine, when a warning specifically mentions the circumstances complained of, the warning is adequate as a matter of law. *Rolen v. Burroughs Wellcome Co.,* 856 S.W.2d 607, 609 (Tex.App.-Waco 1993); *McNeil v. Wyeth,* 462 F.3d 364 (5th Cir.2006). However, when a warning is either inadequate or misleading, the manufacturer remains liable for injuries sustained by the patient. *McNeil, supra* note 3, at 368. To recover for a failure to warn under this doctrine, Plaintiff must show (1) a defective (or misleading) warning; and (2) the failure to warn was a producing cause of his death. *Porterfield v. Ethicon, Inc.,* 183 F.3d 464, 468 (5th Cir.1999) (citation omitted).

### Was the Warning Defective?

Even though the condition or contraindication is mentioned, if the label is misleading as to the risk level for the developing the condition, the warning is defective. *See McNeil, supra.* Plaintiff complains that labeling should have warned about the increased risk of suicide particularly during the early phases of therapy and a need for a wash out period when switching from one SSRI drug to another. The package insert for Effexor notes that "the possibility of a suicide attempt is inherent in depression" and advises close supervision. This is the only mention of a "risk of suicide" contained in the insert. Defendant relies on the lower court's ruling in *McNeil* for the support of its position that the mere mention of risk suffices. Howev-

er, the Fifth Circuit has expressly ruled otherwise. Here Plaintiff argues that there should have been some disclosure that for a small subset of patients, suicidal ideation is a risk of taking Effexor. If preemption does not apply, then a fact issue as to the first prong of Plaintiff's *state law* claim on failure to warn exists.

### If warnings were inadequate, was such inadequacy a producing cause of Ackermann's death?

■ Is there a fact issue as to causation? Ackermann took a low dosage of Effexor for a very short period of time, a week or less. The toxicology reports indicate no Effexor (venalafaine) in the post mortem blood sample. The only drug noted is 50 micrograms of citalopram (Celexis) which is consistent with a therapeutic application of the drug. (Def.'s Mot. Summ. J., Ex. J, Barbieri Dep. 9:2–5, June 13, 2006). There is also evidence that Ackermann told one of his treating doctors on the date of his suicide that he was not suicidal. His wife commented to medical personnel that he was on Celexa and had been acting strangely while taking *it.* The package insert does not recommend a wash out period when the drug has been taken for a week or less and Dr. Sonn indicates that no wash out period is indicated for such a low dosage.

There is a dearth of evidence linking Effexor to Ackermann's suicide. The testimony of Dr. Sonn indicates that in spite of the lack of a specific warning as advocated by the Plaintiff, he knew at the time he treated Ackermann that there was some discussion concerning antidepressants having a causative effect in regard to suicide and that is a risk he considered in prescribing the drug. (Sonn Dep. 38: 1–18). He was also aware that in some patients taking Effexor and other antidepressants attempted suicide and had sui-

cide ideation. (Sonn Dep. 44: 1–7; 45:7–15). Plaintiff claims there is nothing to indicate that Dr. Sonn was then or is now aware what a "legally adequate" warning from Wyeth would have told him. Plaintiff contends that Dr. Sonn did not know at the relevant time *all* the information which would have been included in a proper warning. *See Garside v. Osco Drug, Inc.,* 976 F.2d 77 (1st Cir.1992). Plaintiff argues that this is a case of no warning as opposed to an inadequate warning. Dr. Sonn's supplemental unchallenged affidavit unequivocally states that had the warning been included as advocated by the Plaintiff, nothing would have changed his decision to give Ackermann Effexor. (Declaration of Dr. Sonn). Under Texas law, a plaintiff who complains "that a prescription drug warning is inadequate must also show that the alleged inadeqaucy caused her doctor to prescribe the drug for her." *Porterfield v. Ethicon, Inc.,* 183 F.3d 464, 468 (5th Cir.1999); *accord Stewart v. Janssen Pharm.,* 780 S.W.2d 910, 912 (Tex. App.-El Paso 1989). In other words, a plaintiff must show not only that a warning was inadequate, but that it was a "producing cause" of his injuries. *McNeil, supra* at 372. The doctrine of the "learned intermediary" presupposes that the physician will act as an intermediary. This function includes discussing the cost-benefit ratio with the patient if necessary. Where the physician would have adequately informed a plaintiff of the risks of a disease, had the label been sufficient, but fails to do so on that account, and where the plaintiff would have rejected the drug if informed, the inadequate labeling could be a "producing" cause of the injury because it effectively sabotages the function of the intermediary. Here, Dr. Sonn testified that he would not have warned Ackermann of the possibility of an increased risk of suicide, primarily because he did not want to suggest to a depressed patient that suicide was an op-

tion. (Sonn Dep. 52, 117, 118, 121, 123). Dr. Sonn states he was adequately warned of the risks of Effexor. (Sonn Dep. 54). He stated that he did warn Ackermann about the possible side effect of agitation. He stated that he relied on the label as well as his own experience and knowledge when he prescribed Effexor. He testified that even in light of the new black box warnings on Effexor, he would not approach his warnings any different today. (Sonn Dep. 129, 130).

As previously noted, Dr. Sonn was aware of the fact that suicide attempts had been seen on patients taking Effexor. (Sonn Dep. 44). He was also aware that patients who had taken Effexor had been reported to have suicidal ideations. (Sonn Dep. 45). He was also aware that agitation was a possible side effect. (Sonn Dep. 48). In his declaration, he states that had there been a warning as advocated by the Plaintiff, he would still have prescribed the drug as he did and would not have told Ackermann of warnings related to suicide. In *McNeil,* the Court stated that the treating doctor gave conflicting testimony. He testified that he would have still prescribed the drug at issue but would have warned the patient. On the other hand, he testified that he would not have prescribed the drug had the drug label indicated that use for longer than twelve weeks was contraindicated because risks are significant and the benefits of such continued use have not been demonstrated. Here, Dr. Sonn testified that he would not have warned the patient irrespective of the warning. He gave his medical and professional reason for doing so. Even if Plaintiff's wife could demonstrate that Ackermann would not have taken the drug if there was an increased risk of suicide associated with a small group of patients, such is not relevant. Dr. Sonn unqualifiedly states that no matter the scope of the

warning, he would never have communicated such a warning to Ackermann. Unlike *McNeil*, this is not a case where the learned intermediary fails to pass necessary information to the patient because the manufacturer has understated the degree of risk. The Court finds that Wyeth is entitled to Summary Judgment on the learned intermediary doctrine.

### TEX. CIV. PRAC. & REM.CODE § 82.007

Wyeth also claims it is entitled to summary judgment based on TEX. CIV. PRAC. & REM.CODE Section 82.007. The relevant section reads as follows:

a) In a products liability action alleging that an injury was caused by a failure to provide adequate warnings or information with regard to a pharmaceutical product, there is a rebuttable presumption that the defendant or defendants, including a health care provider, manufacturer, distributor, and prescriber, are not liable with respect to the allegations involving failure to provide adequate warnings or information if:

(1) the warnings or information that accompanied the product in its distribution were those approved by the United States Food and Drug Administration for a product approved under the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et seq.), as amended, or Section 351, Public Health Service Act (42 U.S.C. § 262), as amended; or

(2) the warnings provided were those stated in monographs developed by the United States Food and Drug Administration for pharmaceutical products that may be distributed without an approved new drug application.

(b) The claimant may rebut the presumption in Subsection (a) as to each defendant by establishing that:

(1) the defendant, before or after premarket approval or licensing of the product, withheld from or misrepresented to the United States Food and Drug Administration required information that was material and relevant to the performance of the product and was causally related to the claimant's injury;

(2) the pharmaceutical product was sold or prescribed in the United States by the defendant after the effective date of an order of the United States Food and Drug Administration to remove the product from the market or to withdraw its approval of the product;

(3)(A) the defendant recommended, promoted, or advertised the pharmaceutical product for an indication not approved by the United States Food and Drug Administration;

(B) the product was used as recommended, promoted, or advertised; and

(C) the claimant's injury was causally related to the recommended, promoted, or advertised use of the product;

(4)(A) the defendant prescribed the pharmaceutical product for an indication not approved by the United States Food and Drug Administration;

(B) the product was used as prescribed; and

(C) the claimant's injury was causally related to the prescribed use of the product; or

(5) the defendant, before or after premarket approval or licensing of the product, engaged in conduct that would constitute a violation of 18 U.S.C. Section 201 and that conduct caused the warnings or instructions approved for the product by the United States Food and Drug Administration to be inadequate.

TEX. CIV. PRAC. & REM.CODE Section 82.007 (2003).

Wyeth claims that it is entitled to judgment based on this presumption statute. Subsection (a) provides that there is a rebuttable presumption that Wyeth is not liable for inadequate warnings when such warnings are approved by the FDA. Wyeth also claims that subparagraph (1) is preempted by the rules and regulations of the FDA relying on the Supreme Court's decision in *Buckman Co. v. Plaintiffs' Legal Committee,* 531 U.S. 341, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001). Wyeth contends that subparagraph (1) is preempted because it is in effect a fraud on the FDA cause of action and must be severed from section 82.007. Plaintiff claims that Wyeth did not furnish evidence of foreign suicides to the FDA and therefore cannot rely on 82.007(a). Plaintiff also argues that the statute is unconstitutional, cannot be severed, and asks the Court to declare the statute unconstitutional.

■■■■ A presumption is a guide for courts in fixing the burden of producing proof. *See Gen. Motors Corp. v. Saenz,* 873 S.W.2d 353, 359 (Tex.1993). When a presumption arises, it shifts the burden of producing evidence to the party against whom the presumption operates. *See id.* Once evidence contradicting the presumption has been offered, the presumption disappears and is not weighed or treated as evidence. *Id.* The facts supporting the presumption remain in evidence and can support any reasonable inferences that may be drawn. *Id.* The presumption does not affect the burden of persuasion. *Id.* Statutory presumptions operate in the same manner as presumptions developed through common law. *See, e.g.,* TEX. PROP. CODE ANN. § 92.109(d) (Vernon 1984); *Leskinen v. Burford,* 892 S.W.2d 135, 136 (Tex.Civ.App.-Houston [14th Dist.] 1994); *City of Garland v. Dallas Morning News,* 969 S.W.2d 548 (Tex.App.-Dallas 1998), *aff'd,* 22 S.W.3d 351 (Tex.2000). The effect of a statutory presumption is to force the party against whom it operates to produce evidence to negate the presumption. *Balawajder v. Tex. Dept. of Criminal Justice Institutional Div.,* 2006 WL 2192613, at *3 (Tex.App.-Houston [1st Dist.] July 31, 2006, *pet. filed* ). In the context of a summary judgment, the party against whom a statutory presumption operates must produce sufficient evidence for the case to proceed to trial. *Id.* The Court disagrees with Wyeth's characterization that subparagraph (1) creates a cause of action of fraud on the FDA. The statute creates no cause of action. In fact, Wyeth has pled the statute as an affirmative defense.

■■■■ The Supreme Court has held that state law fraud on the FDA claims inevitably conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives. *Buckman,* 531 U.S. at 345, 121 S.Ct. 1012. Two recent circuit court opinions have analyzed a similar state statute and reached opposite results in determining whether the statute is preempted in light of *Buckman. See Garcia v. Wyeth–Ayerst Labs.,* 385 F.3d 961 (6th Cir.2004); *Desiano v. Warner–Lambert & Co.,* 467 F.3d 85 (2006). Suffice to say, the Court believes that the language of section 82.007(a) creates nothing more than a presumption which the Defendant is free to raise. It does not create a cause of action where none existed before. If Plaintiff comes forward with evidence that the FDA was somehow misled, Plaintiff has merely rebutted a presumption that the manufacturer is not liable. The rebuttal evidence does not establish liability. Such evidence only prevents the manufacturer from obtaining a judgment in its favor without introducing other evidence such as a doctor's testimony that even with a "defective" warning, he still would have prescribed the drug in conformity with his

actions without the desired warning. Therefore, the only question is whether Plaintiff has set forth some evidence to prevent Wyeth from obtaining judgment in its favor in light of the statute. Plaintiff argues that foreign incidents were not reported to the FDA. Wyeth argues that foreign incidents need not be reported. The Court declines to recommend summary judgment based on a presumption.

## *RECOMMENDATION*

Based upon the foregoing, it is the Court's recommendation that Wyeth's Motion for Summary Judgment be granted on all grounds except as to the claim for relief under the TEX. CIV. PRAC. AND REM.CODE Section 82.007.

Within ten (10) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn,* 474 U.S. 140, 148, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Rodriguez v. Bowen,* 857 F.2d 275, 276–77 (5th Cir.1988).